**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MINGBO CAI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SWITCH, INC., ROB ROY**,** GABE NACHT, ZAREH SARRAFIAN, DONALD SNYDER, TOM THOMAS, BRYAN WOLF, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BMO CAPITAL MARKETS CORP., WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES, JEFFERIES LLC, BTIG, LLC, RAYMOND JAMES & ASSOCIATES, INC., STIFEL, NICOLAUS & COMPANY, INC. and WILLIAM BLAIR & COMPANY, L.L.C., <br><br> Defendants. | **Case No.** <br><br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Mingbo Cai ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among

1

other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Switch, Inc. ("Switch" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities action on behalf of a class consisting of all persons who purchased or otherwise acquired Switch Class A common stock pursuant to and/or traceable to the Company's initial public offering commenced on or around October 6, 2017 (the "IPO" or the "Offering") seeking to recover damages caused by Defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o).

3.      This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

4.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) as the Company conducts business in this Juridical District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the attached Certification, incorporated herein by reference, acquired and held Class A common stock of Switch at artificially inflated prices pursuant and/or traceable to the Company's IPO and has been damaged by the revelation of the Company's material misrepresentations and material omissions. Plaintiff is a citizen of New Jersey.

7.      Defendant Switch, through its operating subsidiary Switch, Ltd., provides colocation space and related services to technology and digital media companies, cloud and managed service providers, financial institutions, government agencies, and telecommunications providers that conduct critical business on the internet. Switch is a Nevada corporation with its principal executive offices located at 7135 S. Decatur Boulevard, Las Vegas, NV 89118. Shares of Switch's Class A common stock are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SWCH."

8.      Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in the Registration Statement issued in connection with the IPO. The Securities Act claims specifically exclude any allegations of fraud, knowledge, recklessness or scienter, do not "sound in fraud" and based solely on strict liability and negligence.

9.      Defendant Rob Roy ("Roy") was at the time of the IPO, the Company's Chief Executive Officer ("CEO"), and the Chairman of the Board of Directors of the Company, and signed or authorized the signing of the Company's Registration Statement.

10.     Defendant Gabe Nacht ("Nacht") was at the time of the IPO, the Chief Financial Officer ("CFO") and Principal Accounting Officer of Switch and signed or authorized the signing of the Company's Registration Statement.

11.     Defendant Zareh Sarrafian ("Sarrafian") is a Director of Switch and signed or authorized the signing of the Company's Registration Statement.

12.     Defendant Donald Snyder ("Snyder") is a Director of Switch and signed or authorized the signing of the Company's Registration Statement.

13.     Defendant Tom Thomas ("Thomas") is a Director of Switch and signed or authorized the signing of the Company's Registration Statement.

14.     Defendant Bryan Wolf ("Wolf") is a Director of Switch and signed or authorized the signing of the Company's Registration Statement.

15.     Defendants Roy, Nacht, Sarrafian, Snyder, Thomas and Wolf are referred to herein as the "Individual Defendants." Defendants Roy and Nacht are referred to herein as "Executive Defendants."

16.     The Individual Defendants each participated in the preparation of and signed (or authorized the signing of) the Registration Statement and the issuance of the Registration Statement.

17.     The Individual Defendants are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement. By virtue of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Switch's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

18.     Defendant Goldman Sachs & Co. LLC ("Goldman") is a financial services company located at 200 West Street 29th Floor, New York, NY 10282. Goldman acted as an underwriter for the Company's IPO. In the IPO, Goldman agreed to purchase 8,361,487 shares of the Company Class A common stock, exclusive of any over-allotment option.

19.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial services company located at 277 Park Avenue New York, NY 10172. J.P. Morgan acted as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 8,361,487 shares of the Company Class A common stock, exclusive of any over-allotment option.

20.     Defendant BMO Capital Markets Corp. ("BMO Capital") is a financial services company located at 3 Times Square 28th Floor, New York, NY 10036. BMO Capital acted as an underwriter for the Company's IPO. In the IPO, BMO Capital agreed to purchase 4,013,513 shares of the Company Class A common stock, exclusive of any over-allotment option.

21.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is a financial services company located at 550 South Tryon Street, 6th Floor, D1086-060 Charlotte, NC 28202. Wells Fargo acted as an underwriter for the Company's IPO. In the IPO, Wells Fargo agreed to purchase 4,013,513 shares of the Company Class A common stock, exclusive of any over- allotment option.

22.     Defendants Goldman, J.P. Morgan, BMO Capital and Wells Fargo acted as the representatives of the Underwriter Defendants (defined herein) with respect to the IPO.

23.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company located at 390-388 Greenwich Street, New York, NY 10013-2396. Citigroup acted as an underwriter for the Company's IPO. In the IPO, Citigroup agreed to purchase 1,750,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

24.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company located at 11 Madison Avenue 24th Floor, New York, NY 10010. Credit Suisse acted as an underwriter for the Company's IPO. In the IPO, Credit Suisse agreed to purchase 1,750,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

25.     Defendant Jefferies LLC ("Jefferies") is a financial services company located at 520 Madison Avenue, 10th Floor, New York, NY 10022. Jefferies acted as an underwriter for the Company's IPO. In the IPO, Jefferies agreed to purchase 1,000,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

26.     Defendant BTIG, LLC ("BTIG") is a financial services company located at 600 Montgomery Street, 6th Floor, San Francisco, CA 94111. BTIG acted as an underwriter for the Company's IPO. In the IPO, BTIG agreed to purchase 500,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

27.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a financial services company located at 880 Carillon Parkway, St. Petersburg, FL 33716-1102. Raymond James acted as an underwriter for the Company's IPO. In the IPO, Raymond James agreed to purchase 500,000 shares of the Company Class A common stock, exclusive of any over- allotment option.

28.     Defendant Stifel, Nicolaus & Company, Inc. ("Stifel, Nicolaus & Company") is a financial services company located at 501 North Broadway, One Financial Plaza, St. Louis, MO 63102. Stifel, Nicolaus & Company acted as an underwriter for the Company's IPO. In the IPO, Stifel, Nicolaus & Company agreed to purchase 500,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

29.     Defendant William Blair & Company, L.L.C. ("William Blair") is a financial services company located at 150 North Riverside Plaza, Chicago, IL 60606. William Blair acted as an underwriter for the Company's IPO. In the IPO, William Blair agreed to purchase 500,000 shares of the Company Class A common stock, exclusive of any over-allotment option.

30.     Defendants Goldman, J.P. Morgan, BMO Capital, Wells Fargo, Citigroup, Credit Suisse, Jefferies, BTIG, Raymond James, Stifel, Nicolaus & Company and William Blair are collectively referred to herein as the "Underwriter Defendants."

31.     Defendant Switch, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

32.     The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

        a.     The Underwriter Defendants are investment banking houses which specialize in, *inter alia,* underwriting public offerings of securities. They served as the underwriters of the IPO and shared, along with the rest of the selling syndicate, more than $33.6 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Switch stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and the Executive Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

        b.     The Underwriter Defendants also demanded and obtained an agreement from Switch that Switch would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Switch had purchased millions of dollars in directors' and officers' liability insurance.

7

       c.      Representatives of the Underwriter Defendants also assisted Switch and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Switch, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Switch's operations and financial prospects.

       d.      In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Switch's management, top executives, and outside counsel and engaged in "drafting sessions" between at least June 2017 and October 2017. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Switch stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Switch would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and management and top executives, the Underwriter Defendants knew, or should have known, of Switch's existing problems as detailed herein (defined herein).

       e.      The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to plaintiff and the Class (defined herein).

33.     On this basis, the Underwriter Defendants knew, or should have known, of Switch's existing business concerns and shortcomings, as discussed *infra*, and, pursuant to the Securities Act, are liable for the false and misleading statements in the Registration Statement.

## SUBSTANTIVE ALLEGATIONS

34.     Switch develops and operates data center facilities that provide colocation, telecommunications, cloud services and content ecosystems. Switch aims to create a sustainable and cost-effective growth of the internet and its related services using a proprietary technology platform and its own data centers located at the Company's campuses.

35.     Switch's business is based on a recurring revenue model comprised of: (1) colocation, which includes the licensing of cabinet space and power in one of Switch's data centers to outside businesses; and (2) connectivity services. These services are considered recurring because Switch's customers are generally billed on a fixed and recurring basis each month for the duration of their contract.

36.     In 1998, the Enron Corporation ("Enron") had begun constructing the "Enron Bandwidth Arbitrage Center" in Las Vegas. The facility was built in a rundown area of Las Vegas near East Sahara Avenue, constructed right over the "backbone" of fiber optic cables providing service to technology companies nationwide, which Enron sought to use as a way to sell bandwidth to internet service providers like a commodity.

37.     In 2002, Roy founded Switch, Ltd. and began building a similar data center facility near Enron's facility.

38.     A week before Enron opened its facility in 2002, Enron declared bankruptcy and soon thereafter the data facility business was put up for sale. Defendant Roy purchased the former Enron facility in 2002 in an auction only attended by him since Enron's "fiber plans were so

secretive that few people even knew about the auction." Enron had invested millions of dollars into its facility which sold for only $930,000.

39.     Until 2008, Switch was mainly a government and military contractor. In 2008, however, Switch began targeting enterprise customers and designing and constructing its own data centers.

40.     On June 13, 2017, Roy formed Switch, Inc. for the purpose of completing the IPO in order to raise additional capital.

41.     At the time of its IPO in October 2017, Switch operated ten data center facilities across three campuses, including two in Nevada (the "Core Campus" in Las Vegas and the "Citadel Campus" in Tahoe/Reno) and one in Michigan (the "Pyramid Campus" in Grand Rapids). The Company had acquired land in June 2017 and begun developing an Atlanta facility slated to open in 2018. The Company refers to each campus as a "Prime" the campus in Atlanta will be called ''The Keep." Across its entire footprint, Switch built out shell capacity for ~4MM gross sq. ft. which is capable of supporting 415 MW when fully built out. Over 49% of the built-out shell space is in Las Vegas, which is the Company's original market, while Tahoe/Reno accounts for 34% and Grand Rapids accounts for 16%. Switch's SUPERLOOP is a fiber network connecting Reno, Las Vegas, San Francisco and Los Angeles in ultra-low latency, which allows California customers to use its lower-cost Nevada facilities.

42.     While Switch earns revenues from providing both colocation and connectivity services, its revenues are earned almost exclusively providing co location services. A colocation data center facility leases space to businesses and other entities for servers and other computing hardware. They typically provide the building, cooling, power, bandwidth and physical security while the customer provides servers and storage.



43.     Unknown to investors at the time of the IPO, Switch's Las Vegas campus, acquired from Enron, was uniquely situated and profitable because of the 62 network providers available at the location and because it purchases bandwidth at significantly below market rates from an undisclosed number of these network providers and then resells it to its Las Vegas customers at very low prices. Despite that these financial dynamics are unique to the Las Vegas operations and not easily duplicated, as Switch has expanded into its new markets in Michigan and Georgia, its management has stated that it has the ability to offer the same bandwidth resell services in the new markets, though in reality it is highly unlikely that Switch will be able to replicate the same number of connectivity options in Grand Rapids and Atlanta, as network providers are likely to see less benefit establishing a presence in these locations than they do in Las Vegas.

44.     For instance, the Grand Rapids Prime campus is built in an area not known for data centers and is offered network connectivity from an estimated fewer than 12 providers. While the Grand Rapids facility opened in June 2016, it was generating less than $10 million in annualized revenue by the time of the IPO. Likewise, overall demand at the Atlanta facility was lackluster considering the more regional/enterprise characteristics of the Atlanta market and what is already

an established competitive landscape. Indeed, at the time of the IPO, Switch had been unable to ascertain an anchor tenant for its Atlanta Prime. During the first nine months of 2017, 94.6% of revenue came from Switch's Las Vegas campus. ***In effect, Switch spent tens of millions of dollars acquiring and building out its Atlanta and Grand Rapids facilities prior to the IPO, but those investments were not nearly as profitable as its investment in the Las Vegas Prime had been, even though Switch's financial forecasts for the new facilities were based on Las Vegas Prime's financial performance.***

45.     Switch also builds all of its facilities to be highly redundant, meaning that in addition to the primary components (generators, cooling, uninterruptible power system (UPS), etc.), each customer deployment has at least one additional component in case of a failure. This is costly. While this is particularly important to enterprise customers who may be running mission critical functions within the data center and thus cannot afford for it to go down, by the time of the IPO, it had become increasingly less important to hyper-scale providers who, as a result of the growing number of data centers around the country they operate out of, were instead building redundancy into their own networks (i.e., if data center 1 goes down they redirect traffic to data center 2 until data center 1 comes back online). While Switch targets both enterprise and hyper-scale customers, considering the location, size and power density of its facilities, a material portion of its new customer growth was coming from hyper-scale customers. Those larger hyper-scale providers also typically pay lower price points than the smaller enterprise customers. ***Therefore, going into the IPO, Switch was not earning the same high return on its costly redundancy investments as it had previously been earning.***

46.     Moreover, Switch had spent significantly more on capital expenditures in the three months leading up to the IPO (July, August and September of 2017), than it had led the market to

12

expect in the Registration Statement and during the IPO roadshow. Switch spent $37.6 million in its Core campus in Las Vegas to expand power and cooling to accommodate additional customer density needs and to begin site work on an expansion scheduled to open at the end of 2018. Switch also spent $21.7 million on its Citadel campus in Tahoe/Reno to support additional power and cooling and for construction of data center space opening at the end of 2017. Switch also spent $4.8 million on the buildout of its Pyramid campus in Grand Rapids. This increased its FY17 capital expenditure budget by 40%.

47.     During fiscal year 2017 (ended December 31, 2017) ("FY17") Switch booked and reported some $9.4 million in revenue for colocation services that would not actually be used by its customer eBay until fiscal year 2018 ("FY18") meaning that Switch reported higher FY17 revenue growth than it actually earned and its FY18 revenue growth would be negatively impacted by that same $9.4 million, when Switch was actually providing the colocation services. In fact, eBay's business with Switch was dropping off significantly from 2017 to 2018, in part as a result of the departure of a key executive at eBay in March 2016.

## FALSE AND MISLEADING IPO STATEMENTS

48.     On or about June 29, 2017, Switch filed a draft registration statement on Form S-1 with the SEC. After several amendments, the SEC declared the registration statement effective on October 5, 2017 (Registration No. 333- 220405) and was utilized for the IPO. On or about October 6, 2017, Switch and the Underwriter Defendants priced the IPO at $17 per share, above its previously announced target range of $14-$16 per share, filed with the SEC (on October 10, 2017) the final prospectus for the common stock IPO (the "Prospectus"), which forms part of the Registration Statement (the Prospectus and Registration Statement are collectively referred to herein as the "Registration Statement"), and sold 35,937,500 shares of Class A common stock in

13

the IPO. Simultaneously, Switch issued (i) to the holders of common membership interests of Switch, Ltd. (other than Roy) 173,624,316 shares of Class B Switch common stock (entitled to one vote per share, like the Class A), and (ii) to Roy and an affiliated entity of his, 42,944,647 shares of Class C common stock (entitled to ten votes per share). As a result of his obtaining 100% of the Class C common stock and his already owning 583,728 shares of the Class A common stock, Roy controlled 67.7% of Switch's voting power post-IPO.

49.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

50.     Concerning the source of Switch's increased revenues and financial performance during the first half of FY17 in the lead-up to the IPO, rather than disclosing that the Company had recognized $9.4 million in revenue received from eBay for colocation services that would not be used until FY18, the Registration Statement portrayed that business was growing and year-over-year performance was positive:

> *We have achieved significant growth in our business and have a track record of strong financial performance*. On an annual basis, our revenue has grown from $166.8 million in 2013 to $318.4 million in 2016, representing a compounded annual growth rate, or CAGR, of 24.0%. *We generated net income* o/$73.5 million and $31.4 million during the years ended December 31, 2015 and 2016, respectively, and $35.2 million and *$35.3 million during the six months ended June 30, 2016 and 2017, respectively.*

(Emphasis added).

These statements were false and misleading and omitted material information. Annual compounded revenue growth was overstated by approximately 5% and year-over-year

performance was significantly overstated based on that overstated revenue as well. In fact, Switch's business with eBay was dropping off significantly, as reflected by the revenues misleadingly overstated for fiscal year 2016 ("FY16").

51.     Elsewhere the Registration Statement presented certain "Key Metrics" that it said Switch's management actively "monitor[ed] ... to help [it] *evaluate [its] business, identify trends affecting [its] business, formulate business plans* and *make strategic decisions,*" including recurring revenue which it said increased 20% from $148.5 million in the first six months of FY16 to $177.2 million during the first six months of FY17. The Registration Statement also stated that Switch "calculate[d] recurring revenue as contractual revenue under signed contracts calculated in accordance with GAAP for the applicable period," and that its "[m]anagement use[d] recurring revenue as a supplemental performance measure because *it provides a useful measure of increases in contractual revenue from [its] customers and provides a baseline revenue measure on which to plan expenses.*" (Emphasis added).

52.     As to when Switch recognized revenue received from its customers, the Registration Statement stated in relevant part:

> Revenue from recurring revenue streams is generally billed monthly and *recognized ratably over the period to which the service relates*. Contracts with our customers generally have terms of three to five years. Non-recurring installation fees, although generally paid in a lump sum upon installation, are deferred and recognized ratably over the expected life of the installation, which was 89 months, 73 months and 73 months as of December 31, 2015 and 2016 and June 30, 2017, respectively. Revenue from connectivity services is recognized on a gross basis, primarily because we act as the principal in the transactions, take title to services and bear credit risk. *Revenue from contract settlements, which result when a customer wishes to terminate their contract early, is recognized when no remaining performance obligations exist, to the extent that the revenue has not previously been recognized.*

(Emphasis added).

15

53.     The Registration Statement continued:

*Revenue increased by $26.5 million, or 17%, for the six months ended June 30, 2017*, compared to the six months ended June 30, 2016. The increase in revenue was primarily attributable to a $19.4 million increase in colocation revenue and a $6.8 million increase in connectivity revenue, which resulted from increased sales as we expanded the facilities in The Core Campus throughout 2016 and opened the first facilities in The Pyramid Campus and The Citadel Campus in June 2016 and November 2016, respectively. Approximately 63% of the increase in sales was attributable to new customers initiating service after June 30, 2016, *and the remaining approximately 3 7% of the increase in sales was attributable to growth from existing customers. We believe the increase in revenue was primarily related to increased volume*, rather than an increase in the prices we charge our customers.

*          *          *

*Quarterly Trends in Revenue*

Our quarterly revenue increased in each period presented *primarily due to an increase in the sale of our services as a result of the construction and expansion of our data centers, increasing brand awareness and the success of our sales efforts with existing customers and new customers.*

(Emphasis added).

54.     The statements above in ¶¶51-53 were false and misleading and omitted material information. Switch had recognized $9.4 million of contract revenue from eBay for 2017 even though no services had been performed for eBay in the relevant facility. Furthermore, the "key metric" of Switch's recurring revenue was overstated for 2017 by $9.4 million, meaning that the revenue growth that the Company supposedly monitored was approximately 13% and not 20% year- over-year first six months of 2016 to first six months of2017 - an overstatement of approximately 53%. And with respect to the reported significant "growth" in sales from existing customers, that growth was also significantly overstated due to the revenue from eBay recorded in 2017 even though no services were performed. Likewise, the Registration Statement heralded with respect to the year-over-year revenues "growth" that "37% of the increase in sales was attributable

to growth from existing customers" and "primarily due to ... construction and expansion of our data centers, increasing brand awareness and the success of our sales efforts." But this was false and misleading because a significant amount of the purported growth was due to $ 9.4 million of contract revenue from eBay for 2017 even though no services had been performed for eBay for that revenue. The statements were also false and misleading for omitting that nearly all of the sales growth was due to sales revenue in one campus only – the Core campus.

55.    Emphasizing the overall strength of Switch's business model and inferring that the unique financial dynamics of Switch's Nevada facilities could be applied to its Grand Rapids and soon-to-be launched Atlanta facilities, the Registration Statement stated in pertinent part as follows:

### The Network Effects Across our Technology Infrastructure Platform and Ecosystem

Our technology infrastructure platform supports *a dynamic technology ecosystem* bringing together enterprises and service providers, including cloud and managed services providers and telecommunications carriers. *Participants benefit from the proximity to these service providers, customers and collaborators.* Our platform and our ecosystem have independent but synergistic *self-proliferating network effects* that benefit participants as we continue to innovate, our platform evolves *and our ecosystem grows. As our platform and customer base expands, we continue to realize growing efficiencies of scale,* which allows us to provide higher value services to our customers.

\*      \*      \*

### Our Competitive Strengths

\*      \*      \*

***Differentiated Technology Ecosystem Underscored by Powerful Network Effects***

We operate *a dynamic technology ecosystem* that brings together a wide variety of parties. As we continue to innovate, we believe our customer value proposition strengthens, *attracting new customers and encouraging existing customers to grow with us.* This *expanding, diverse mix of enterprise customers* attracts cloud service

providers, managed services providers and telecommunications carriers. ***This growing base of service providers, in turn, attracts other new enterprise customers*** seeking an environment with diverse, high-quality service providers and other innovative companies with which to collaborate.

*       *       *

We presently own and operate three primary campus locations, called Primes, which encompass ten colocation facilities with an aggregate of up to 4.0 million gross square feet, or GSF, of space. These facilities have up to 415 megawatts, or MW, of power available to them. Our Primes consist of The Core Campus in Las Vegas, Nevada; The Citadel Campus near Reno, Nevada; and The Pyramid Campus in Grand Rapids, Michigan.

*       *       *

In addition, we recently purchased land to develop a fourth Prime, The Keep Campus, in Atlanta, Georgia. ***Our Primes are strategically located in geographies that combine a low risk of natural disaster, favorable tax policies for customers deploying computing infrastructure and low latency connectivity to major metropolitan markets, such as Los Angeles, San Francisco, Silicon Valley, Chicago, New York, Northern Virginia and Miami. As a result, customers in these metropolitan markets can access our advanced colocation facilities while reducing exposure to the higher taxes, higher cost of power and higher risk of natural disaster that might be prevalent in other markets.*** …

We have fostered the development of a robust technology ecosystem around our platform that consists of enterprises and service providers that include cloud and managed services providers and telecommunications carriers. ***Both our platform and our ecosystem have self-reinforcing network effects that benefit participants as both our platform and our ecosystem grows. As our platform and customer base expands, we continue to realize growing efficiencies of scale, which allows us to provide higher value services to our customers.***

We believe our advanced platform, high level of service and competitive pricing create a disruptive platform with a powerful customer value proposition that differentiates us from many other existing solutions. Our advanced data centers are designed for efficiency and allow our customers to achieve higher than average power densities per cabinet with appropriate cooling, which we believe improves the performance and increases the life of our customers' equipment. ***We located our data centers in areas with tax benefits, such as low or no sales tax on equipment, and access to competitively priced renewable power, both of which help further lower our customers' total cost of ownership.*** …

***We believe that our technologies enable attractive cash flow yields on invested capital Our modular expansion and vertically integrated development approach***

18

*allows us to deploy capital efficiently, which further increases our yields. Across our current facilities, we have generated on average a 22.7% yield on invested capital in 2016. We define cash flow yield on invested capital as Adjusted EBITDA less corporate taxes and maintenance capital expenditures, divided by total assets, less cash and equivalents, construction in progress, and non-interest-bearing liabilities.*

\*       \*       \*

***Our Growth Strategy***

Our goal is to enable the current and future compute needs of our customers and to facilitate technological advancement through smart and sustainable infrastructure solutions designed to support the most innovative technology ecosystems in the world. To accomplish this, we plan to:

•       ***Continue to Grow Our Existing Prime Campus Locations****.   We currently operate The Core Campus, The Citadel Campus and The Pyramid Campus in or near Las Vegas, Reno and Grand Rapids, respectively, and have secured land for The Keep Campus in Atlanta. These Primes currently encompass ten data centers with an aggregate of up to 4.0 million GSF of space and up to 415 MW of power available to these facilities. **We plan to continue to expand these Primes and actively pursue additional customers with strategic fit for our ecosystem, as well as sell additional solutions to existing customers. Each of our Primes has room for expansion, and we currently have designs to add up to approximately 5.9 million GSF of additional space to The Citadel Campus and approximately 940,000 GSF of additional space to The Pyramid Campus.***

\*       \*       \*

***We carefully chose the locations of our U.S. campuses based on characteristics that we believed would help drive resiliency, performance and cost efficiencies for our customers. Our Prime campus locations are located in areas with low natural disaster risk****. For example, the State of Nevada boasts the lowest natural disaster rating in the Western United States. **Additionally, each of these locations offers favorable tax and economic development policies that provide zero or low-tax environments for our customers to deploy IT equipment***. While all of our locations offer a lower-cost source of 100% renewable power, there are additional efficiency advantages. For example, the Nevada climate is characterized by low humidity and relatively stable temperatures for most of the year. This improves cooling efficiencies and reduces power consumption. ***We own most of our facilities, and where the land and shell are not owned, we hold long-term leases on those assets.***

(Emphasis added).

19

56.     The Registration Statement also stated Switch had "more than 800 customers," its "customer base is meaningfully diversified across key industries," and that "[f]or the six months ended June 30, 2017 ... no single customer accounted for more than 10% of revenue." Here the Registration Statement also emphasized that because Switch "provide[s] [its] customers with a consistent experience and high level of service *at low cost* ... customers remain loyal" and the Company "derive[s] a significant amount of ... growth from existing customers." The Executive Defendants communicated a similar statement in an IPO roadshow slide used to market the IPO. (Emphasis added).

57.     The statements in ¶¶55-56 above were false and misleading and omitted material facts. The "efficiencies of scale" and "cost efficiencies" referenced were not supported by the economics of Switch's campuses aside from the Core campus. The Company's Prime campuses were expensive relative to other facilities and that is what "differentiated" the Company's campuses. Nearly all of the Company's "yield on invested capital" was from the Core campus. That was not a "competitive strength" - it was a weakness, for the Company's other campuses were not (and could not be) as profitable as Switch's Core campus. Indeed, Switch's "growth strategy" was a farce insofar as it was based on "cost efficiencies," for the Company's new campuses were not cost efficient like the Core campus. Furthermore, "low cost" was not and could not be part of the Company's growth strategy for any campuses other than the Core campus. And although eBay accounted for just under 10% of the Company's revenue during the six months ended June 30, 2017, the Registration Statement was misleading for failing to omit the significant impact of $9.4 million of contract revenue from eBay recorded for 2017 even though no services had been performed for eBay for that revenue, and eBay's business with Switch was significantly dropping off due to a change in the relationship between the two companies.

58.     Concerning the Company's ongoing capital expenditure trends, the Registration Statement stated in pertinent part as follows:

> During the six months ended June 30, 2017, cash used in investing activities was $219.9 million, ***primarily consisting of capital expenditures of $219.9 million related to the expansion of our data center facilities.***
>
> *          *          *
>
> During the year ended December 31, 2016, cash used in investing activities was $292.0 ***million, primarily consisting of capital expenditures of $287.1 million related to the expansion of our data center facilities,*** purchases of notes receivable of $3.0 million, and an additional investment of $1.5 million in Planet3.

These statements were false and misleading and omitted material information. Switch had ***already spent an additional more than $64 million*** on unbudgeted capital expenditures during the third quarter of 2017 (ended September 30, 2017) - that was on top of the $253.8 million in FYl7 capex expenditures already budgeted for FYl7, ***a 40% increase.***

59.     Defendants also lauded the financial performance of Switch's facilities with false and misleading statements. In IPO roadshow slides used to market the IPO to investors, the Executive Defendants also relied on inflated revenue figures in a "Financials" slide for "Company Comparison" to purportedly favorably compare Switch to industry companies, stating Switch had experienced "20% Revenue" compound annual gross revenue growth 2013 to 2016. The slide emphasized "GROWTH" next to "20% Revenue." And the Executive Defendants presented in a "Historical Revenue" slide a graphics arrow showing steep "CAGR" or compound annual growth rate of gross revenue of "25.4%" from 2013 to 2016. Emphasizing a "HISTORY OF PROFIT ABLE, ORGANIC GROWTH," the Executive Defendants used an IPO roadshow slide to investors with a graphic arrow pointing upwards and relying on inflated revenue figures to communicate "CAGR" or compound annual growth rate of gross revenue of "23.9%" from 2013

to 2016. Similarly, a graphic arrow pointing upwards and relying on inflated revenue figures to communicate "17.1 % Growth" in "Revenue" for "YTD Q2 '16" to "YTD Q2 '17" or year-to-date second quarter 2016 to 2017.

60.     The statements referenced above in ¶59 were false and misleading and omitted material information. Switch had recognized $9.4 million of contract revenue from eBay for 2017 even though no services had been performed for eBay in the relevant facility. Switch's revenue growth was materially overstated. Indeed, the purported "17%" year-over-year increase in revenue was *overstated by approximately 31%* for failing to exclude $9.4 million of contract revenue from eBay.

61.     The statements referred about in ¶¶50-60 were each materially false and misleading because they failed to disclose and mispresented the following adverse facts that existed at the time of the IPO:

a.     Switch's Grand Rapids and Atlanta facilities would never be as profitable as its Las Vegas facility, diminishing the yield on Switch's recent capital expenditures acquiring and building out those facilities will bear;

b.     Switch's high capital expenditures to create high redundancy levels at its facilities were not as profitable as they once had been in the past because of the growing contingent of larger hyper-scale providers who do not need the higher levels of redundancy at the individual facility level and who also pay a lower price point than the smaller enterprise customers who do;

c.     Switch had already spent an additional more than $64 million on unbudgeted capital expenditures during the third quarter of 2017 (ended September 30,

2017) (on top of the $253.8 million in FY17 capex expenditures already budgeted for FY17, a 40% increase), that would not be disclosed to investors until after the IPO;

        d.        Switch had recognized $9.4 million in revenues during FY17 that it would not provide colocation services for until FY18, meaning its reported FY17 revenue growth its FY18 revenue prospects were both overstated;

        e.        eBay, Switch's largest colocation customer, would not be taking possession of colocation space it had reserved at Switch's Tahoe/Reno facility in early 2018; and as a result of the foregoing, at the time of the IPO, the Company's business and financial prospects were not what defendants had led the market to believe they were in the Registration Statement.

62.        Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. At the time of the IPO, unbeknownst to investors, Switch's capital investments in its Grand Rapids and Atlanta locations, and in its high level of redundancy at the individual plant level, were not going to be as profitable as investors were led to believe; Switch had already blown its FY17 capex spending budget by 40% during the quarter ended September 30, 2017; eBay, Switch's largest customer, was not taking the space reserved for it at the Tahoe/Reno facility; and Switch had overstated its FY17 revenue growth and FY18 financial prospects by recognizing $9.4 million in revenue from eBay that would not be earned until FY18. The adverse events and uncertainties associated with these negative trends were reasonably likely to have a material impact on Switch's profitability, and, therefore, were required to be disclosed in the Registration Statement, but were not.

63.     The IPO was successful for the Company and the Underwriters Defendants who sold more than 35.9 million shares of Switch common stock to the investing public, raising $610.9375 million in gross proceeds ($577.336 million net of underwriting fees and IPO costs).

## THE TRUTH EMERGES AND SWITCH'S COMMON STOCK PRICE FALLS

64.     On November 13, 2017, Switch issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the third fiscal quarter and nine month ended September 30, 2017 ("Q3 2017 Press Release"). The press release stated in relevant part:

> LAS VEGAS, Nov. 13, 2017 – Switch, Inc. (NYSE: SWCH) today announced financial results for the quarter ended September 30, 2017.
>
> "Switch delivered a strong third quarter, achieving its highest-ever revenue and operating profit for a single quarter," said Rob Roy, CEO, chairman and founder of Switch. "All of our growth was organic, and we ended the quarter with over 800 customers, adding notable enterprises to our customer base. Our innovative, patent-protected technology and strategically located hyperscale campus ecosystems continue to be key differentiators leading customers to choose Switch for their mission critical data."
>
> Third Quarter 2017 Financial Highlights
>
> •      Total revenue of $97.7 million, compared to $81.7 million for the same quarter last year, an increase of 20%.
>
> •      Operating income of $25.5 million, compared to operating income of $16.4 million for the same quarter last year, an increase 55%.
>
> •      Net income of $16.5 million, compared to $15.9 million for the same quarter last year.
>
> •      Adjusted EBITDA of $49.7 million, compared to $34.6 million for the same quarter last year, an increase of 44%. Adjusted EBITDA margin of 50.9%, compared to 42.4% for the same quarter last year, an increase of 850 basis points.
>
> •      ***Capital expenditures of $64.1 million, compared to $88.9 million in the same quarter of 2016, a decrease of 28%.***

- Churn of 0.3% and 0.5% for the three and nine months ended September 30, 2017. Churn is defined as a reduction in recurring revenue attributed to customer terminations or non-renewal of expired contracts, as a percentage of revenue at the beginning of the period.

\*       \*       \*

**2017 Guidance**

For the full year 2017, Switch provides the following guidance:

- Total revenue in the range of $372 million to $380 million.

- Adjusted EBITDA in the range of $190 million to $195 million.

- ***Capital expenditures in the range of $345 million to $365 million.***

- Class A fully weighted average basic share count of 36 million to 37 million.

- Class A fully weighted average diluted share count of 36.5 million to 38 million.

(Emphasis added).

65.     During a conference call to discuss Switch's financial and operating results for the third fiscal quarter and nine-months ended September 30, 2017 ("Q3 2017 Conf. Call"), Switch's CFO Defendant Nacht iterated that the Company's capital expenditures for the quarter had totaled $64.1 million and the capital expenditures guidance was expected to be in the range of $345 million and $365 million, a considerable increase to the capital expenditures already budgeted at the time of the IPO, unbeknownst to investors who purchased Switch's Class A common stock.

66.     On January 19, 2018, Cowen Equity Research initiated coverage of the stock with a price target at $15 per share of Class A common stock citing that the "***current premium is unjustified***." The report, entitled "Initiation: previous success will likely be difficult to replicate" stated in relevant part:

**Data Center Design Impressive Looking, But Relative Benefit Less Clear**

Switch describes itself as a technology infrastructure company, noting it has 400+ patents issued and pending and that its unique design provides greater resiliency and efficiency than competitors. While we don't doubt that the company is extremely focused on innovation and that certain aspects of its design are unique, such as its Redundant Data Center Roofing System (Switch Shield), others such as its Exterior Wall Penetrating Multi-Mode HVAC units (Switch TSC), which essentially isolate CRAC units from customer floor space, are not unique. To that point, we question the overall value add of its design considering that many other data centers have high uptime and operate at similar PUEs, although admittedly at lower (albeit adequate) power densities.

**Focus on High Redundancy Likely Contributing to Relatively Low NOI Yield**

Switch has built all of its facilities to be highly redundant, which is particularly important to enterprise customers; ***however, it is becoming increasingly less important to hyper-scale providers who, as a result of the growing number of data centers they operate out of, are instead building redundancy into the network (i.e., if data center 1 goes down they redirect traffic to data center 2 until data center 1 comes back online).*** Combined with the additional design aspects that are unique to Switch facilities, as well as its continued focus on building in high power densities that *we believe in many cases may not be fully utilized, we estimate Switch is generating a relatively low NOI yield compared to comps.*

**Access to Bandwidth Key to Las Vegas Success; But Unclear if Replicable in Other Markets**

Switch's Las Vegas campus is very unique because of the 62 network providers available at the location and because it purchases bandwidth significantly below market rate from an undisclosed number of these network providers and then resells it to its customers at very low prices. ***As the company expands into new markets, mgmt. has stated that it has the ability to offer the same bandwidth resell services in other markets, but we believe it's unlikely that Switch will be able to replicate the same number of connectivity options in Grand Rapids and Atlanta, as network providers are likely to see less benefit establishing a presence in these locations than they do in Las Vegas.***

(Emphasis added).

67.     On April 2, 2018, Switch issued a press release, also attached as exhibit 99.1 to the

Form 8-K filed with the SEC announcing the Company's financial and operating results for the

fourth fiscal quarter and year ended December 31, 2017 ("FY 2017 Press Release"). The press

release stated in relevant part:

> "Switch achieved another year of revenue growth as it continued to expand its
> presence and grow its customer base, while advancing its role in sustainability," said
> Rob Roy, CEO, chairman and founder of Switch. "With our innovative, patent-
> protected technology, we believe Switch is highly differentiated, decidedly
> competitive and unrivaled in our expansion capacity."
>
> 2017 Financial Results
>
> •       Total revenue of $378.3 million, compared to $318.4 million in 2016, an
> increase of 19%.
>
> •       Operating income of $18.8 million, compared to operating income of $51.1
> million in 2016. Operating income in 2017 includes the impact of $71.3 million in
> non-recurring equity-based compensation expense resulting from the accelerated
> vesting of certain incentive units of Switch, Ltd. and related awards granted under
> Switch's 2017 Incentive Award Plan in connection with Switch's initial public
> offering. Excluding the impact of this non-recurring compensation expense,
> operating income would have increased 77% from 2016 to 2017.
>
> •       Net loss of $8.6 million, compared to net income of $31.4 million in 2016,
> which includes $84.8 million in equity-based compensation expense in 2017
> compared with $5.9 million in equity-based compensation expense in 2016.
>
> •       Adjusted EBITDA of $194.7 million, compared to $153.2 million for 2016,
> an increase of 27%. Adjusted EBITDA margin of 51.5%, compared to 48.1% in
> 2016, an increase of 340 basis points.
>
> •       ***Capital expenditures of $402.6 million, compared to $287.1 million in
> 2016***, an increase of 40% primarily due to deployment of capital in The Core
> Campus in response to additional customer demand and density needs along with
> additional capital expenditures to build out The Citadel Campus and The Pyramid
> Campus.
>
> •       Customer churn of 0.6% for the year ended December 31, 2017 compared
> with 1.1% in 2016. (1)
>
> (Emphasis added).

68.     During a conference call to discuss the Company's financial and operating results

for the fourth fiscal quarter and fiscal year ended December 31, 2017 ("FY 2017 Conf. Call"),

Switch's CFO Defendant Nacht stated in relevant part:

CapEx for 2017 totaled $402.6 million, up from $287.1 million in 2016, an increase of 40%. We deployed $201 million of capital in our Core Campus in response to additional customer demand and density needs and opening our Las Vegas 12 facility and 2 new sectors in Las Vegas 10. We also added 20 megawatts of power and cooling capacity, and we began work on our Las Vegas 11 facility, which is planned to open in late 2018 or early 2019 depending on customer demand and adding another 340,000 gross square feet of space and up to 40 megawatts of capacity. We also invested $127 million in The Citadel Campus, opening 2 additional sectors and supporting 20 megawatts of additional power and cooling capacity. In 2017, we spent $68 million on The Pyramid Campus, opening one new sector and adding 10 megawatts of power and cooling. In Q4 of 2017, we also exercised our purchase option for the Pyramid property, purchasing the building and 142 acres of land for $23.9 million.

*     *     *

2017 CapEx came in above our guided range of $345 million to $365 million as we purchased additional parcels of land in Las Vegas and Atlanta totaling 22 acres for $15.3 million. Additionally, we accelerated the purchase of $14.8 million in equipment to take advantage of year-end discounts. Neither of these were included in our previous guidance.

69.     Notwithstanding the fact that the $15.3 million for land in Vegas and Atlanta plus the $14.8 million in equipment still do not add up to the difference between the $345 million to $365 million guidance and the actual $402.6 million in capital expenditures for the fiscal year 2017, the Registration Statement failed to disclose and misrepresented adverse facts regarding Switch's capital expenditures during the fiscal year 2017 that existed at the time of the IPO.

70.     Regarding revenue, Switch's CFO Defendant Nacht disclosed during the FY 2017 Conf. Call that Switch had in fact recognized revenue in 2017 for services that would not occur until 2018. In relevant part:

For 2018, revenue is expected to be in the range of $423 million to $440 million. Our revenue guidance for 2018 over 2017 implies 14% growth at the midpoint. ***This guidance includes a $9.4 million revenue impact due to fees booked in 2017 related to a 7-year $280 million contract closed in 2016 with a strategic customer to reserve space at one of our facilities.*** At the time, the customer was in the process of separating into 2 independent companies and was not yet certain of the space they would need, but contracted with Switch to keep space available through 2017 to

28

provide them with time to finalize their split. Starting in January of 2018, the contract provides for a minimum usage floor which increases monthly through June of 2018, with expectations for usage to return to usual levels in 2019. Adjusted for the impact of this contract, the midpoint of revenue guidance for 2018 would imply growth of 17%.

(Emphasis added).

71.    Surprised, J.P. Morgan Chase & Co, Research Division analyst Yong Choe asked

during the Q&A session of the FY 2017 Conf. Call "why the revenue growth is not kind of …

ramping as fast as the CapEx" to which Defendant Nacht responded:

As we move into '18, however, as I mentioned on the call, we do have a bit of an anomaly because of this contract that we entered into with our strategic customer that is about a $9 million -- $9.4 million impact into '18. And most of that is front-loaded in the year into the first and second quarter. So that does create a bit of a sequential growth challenge, but we're still expecting to see good, strong growth, particularly adjusted for the impact of that contract.

(Emphasis added).

72.    On this news, Switch's Class A common stock fell from a closing price of $15.85

on April 2, 2018, to a closing price of $13.37 on April 3, 2018, a decrease of $2.48 or 15.65%.

73.    In response to this news, Cowen Equity Research issued a report entitled "In-line

4Q17 results and 2018 guidance not enough" which stated in relevant part:

Switch reported 4Q17 revenue/EBITDA results in-line with Street expectations and issued 2018 guidance that while also in-line with Street expectations implies (at the mid-point) that growth will decelerate to 14.1% vs. 18.8% in 2017 and 19.7% in 2016. Guidance includes a $9.4MM negative impact tied to its contract with eBay which we believe will result in a Q/Q revenue decline in 1Q18 and implies revenue will likely need to grow +5% Q/Q in 2H18. Mgmt. noted that eBay was paying Switch $1.7MM/month for reserved space in its Reno facility that stepped down to $500K/mo in January but will ramp back up to $1.2MM/mo by June, although in fairness mgmt. told us they had disclosed this during its IPO after we called out this risk in our January initiation. It remains unclear to us however how much of the contracted space eBay ultimately intends to use. Furthermore, the company's 2018 guidance implies EBITDA margins of 51% vs. 51.5% in 2017, despite the benefit of reduced power costs after becoming an unbundled purchaser of power in Nevada in June 2017, driven we assume by the lost eBay revenue although mgmt.

commented that it intends to manage the business to a long-term EBITDA margin target of ~51% which pushed us to reduce our outer year margin estimates. Separately, Switch provided 2018 capex guidance of $285MM (mid-point) vs. our $249MME as mgmt. noted it was accelerating its Atlanta build although it maintained its planned 2019 opening without providing additional details. Notably, the company did begin disclosing its development milestones (slide 18 of presentation), however in our view there is still much needed in terms of disclosure to properly evaluate the company. Net/net: While initial 2018 guidance was largely in-line with both our and Street expectations, it implies decelerating revenue growth and lackluster margins that by itself in our view suggest the stock is undeserving of a premium valuation. ***In addition, we continue to believe it will be difficult for the company to replicate its level of success in Vegas in other markets – which will become a bigger area of focus in 2019 – while we continue to question the company's return profile.*** While we appreciate mgmt. has big intentions for the company, including the development of its Switched On/Gigawatt Nevada power initiatives and its CORE offer, we do not believe investors should assign any incremental value to them at least at this time. Lastly, we'd point out that the IPO lock-up expires today (April 3). Maintain Underperform.

(Emphasis added).

74.     Plaintiff and other members of the Class ultimately suffered financial harm from the acquisition of Switch's Class A common stock.

75.     The Company's statements in the Registration Statement, taken individually and collectively, were materially false and misleading because they failed to disclose and misrepresented adverse facts that existed at the time of the IPO.

76.     The price of Switch common stock has since plummeted and now trades at around $13 per share, or approximately 23.5% less than it sold at in the IPO.

77.     As such, Plaintiff and members of the Class have been injured.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and/or entities who purchased or otherwise acquired the Class A common stock of Switch pursuant and/or traceable to the Company's false and/or misleading Registration Statement issued in connection with the

Company's IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

79.    Defendant Switch, through the Underwriter Defendants, sold 35,937,500 shares of Class A common stock in the IPO. As reported in the Company's quarterly report filed on Form 10-Q with the SEC on November 14, 2017, as of November 10, 2017, Switch had 35,937,500 shares of Class A common stock issued and outstanding, indicating that all shares purchased on the open market to that date were directly traceable to Switch shares offered in the IPO.

80.    The members of the Class are so numerous that joinder of all members is impracticable. During the relevant time period, Switch's Class A common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Switch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.   whether Defendants violated the Securities Act;

      b.   whether statements made by Defendants to the investing public in the Registration Statement were false and/or misrepresented material facts about the business and operations of Switch; and

      c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

84.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violations of §11 of the Securities Act
## Against Switch, the Individual Defendants, and the Underwriter Defendants

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

87.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

88.     The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

89.     The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

90.     The Underwriter Defendants each served as underwriters in connection with the IPO. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that

33

would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

91.     By reason of the conduct herein alleged, each Defendant named herein violated, §11 of the Securities Act.

92.     Plaintiff acquired Switch Class A common stock pursuant or traceable to the Registration Statement used for the IPO without knowledge of the material omissions or misrepresentations alleged herein.

93.     Plaintiff and the Class have sustained damages, as the value of Switch Class A common stock has declined substantially subsequent to and due to these Defendants' violations.

94.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## COUNT II
## Violations of §12(a)(2) of the Securities Act Against Switch and the Underwriter Defendants

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) on behalf of the Class, against Switch and the Underwriter Defendants. This is

a non-fraud cause of action. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

97.     By means of the defective Offering Documents, Switch, and the Underwriter Defendants promoted and sold Switch stock to Plaintiff and other members of the Class. Switch is liable as an issuer and was motivated by its financial interest in selling more than 35.9 million shares of Class A common stock for proceeds exceeding $577.3 million, after underwriting discounts and commissions. It directed the Registration Statement to the investing public and the Underwriter Defendants sold and solicited sales of Switch stock to the investing public at the behest of Switch.

98.     The Underwriter Defendants are liable for selling and soliciting the sale of Switch stock to investors and were motivated by their fees and commission in doing so. They directed and distributed the Registration Statement to investors. Each of the Underwriter Defendants pitched and sold Switch stock to investors, through their approval and distribution of the Registration Statement, their approval and use of the roadshow, and through direct communications with investors, including their own clients.

99.     The Registration Statement contained untrue statements of material fact, and/ or concealed or failed to disclose material facts, as detailed above. The defendants named in this Cause of Action owed Plaintiff and the other members of the Class who purchased Switch Class A common stock pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

100.    The defendants named in this cause of action, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

101.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, the untruths and omissions contained in the Registration Statement at the time plaintiff acquired Switch Class A common stock.

102.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Switch Class A common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the Class A common stock issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their Class A common stock, and hereby tender their Class A common stock to the defendants sued herein. Class members who have sold their Class A common stock seek damages to the extent permitted by law.

**COUNT III**
**Violations of §15 of the Securities Act Against Switch and the Individual Defendants**

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    This Cause of Action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against Switch, and the Individual Defendants.

105.    The Individual Defendants each were control persons of Switch by virtue of their positions as directors and/or senior officers of Switch. The Individual Defendants each had a series

of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Switch.

106.   Switch controlled the Individual Defendants and all of its employees.

107.   Switch and the Individual Defendants were each critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting to execute the IPO and by having otherwise directed through their authority the processes leading to the execution of the IPO.

108.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's Class A common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 11, 2018     Respectfully submitted,

           **THE ROSEN LAW FIRM, P.A.**

           By: <u>/s/Laurence M. Rosen</u>
           Laurence M. Rosen
           609 W. South Orange Avenue, Suite 2P
           South Orange, NJ 07079
           Tel: (973) 313-1887
           Fax: (973) 833-0399
           Email: lrosen@rosenlegal.com

           Counsel for Plaintiff